[Cite as *State v. Russell*, 2011-Ohio-2789.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 95548**

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## ELIGE RUSSELL

DEFENDANT-APPELLANT

---

**JUDGMENT:**
AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-531556

**BEFORE:** Cooney, J., Blackmon, P.J., and Jones, J.

**RELEASED AND JOURNALIZED:** June 9, 2011

**ATTORNEY FOR APPELLANT**

Thomas A. Rein
Leader Building, Suite 940
526 Superior Avenue
Cleveland, Ohio 44114


**ATTORNEYS FOR APPELLEE**

William D. Mason
Cuyahoga County Prosecutor

By: Carl Sullivan
Assistant County Prosecutor
8th Floor, Justice Center
1200 Ontario Street
Cleveland, Ohio 44113

COLLEEN CONWAY COONEY, J.:

{¶ 1} Defendant-appellant, Elige Russell ("Russell"), appeals his menacing by stalking convictions following a jury trial. We find no merit to the appeal and affirm.

{¶ 2} Russell was charged with three counts of menacing by stalking and one count of telecommunications harassment. The following evidence was presented at the jury trial.

**{¶ 3}** The victim, Cynthia Feliciano ("Feliciano"), testified that she dated Russell on and off for about four years and that they had a baby together ("Tony"). By the end of September 2009, Feliciano decided she no longer wanted to be in a relationship with Russell because she did not approve of his drug and alcohol "lifestyle." She moved out of his home on September 30, 2009 to live with her brother Ronnie Feliciano ("Ronnie") and his girlfriend, Selena McNatt. Feliciano and Russell continued to see each other when Russell visited their son.

**{¶ 4}** As time went by, Russell wanted to spend more time with Feliciano. He called her more frequently and visited her at her job. He often came to her brother's house without notice, sometimes in the middle of the night. Feliciano tired of the frequent phone calls and stopped returning them. One night, after Feliciano closed the Riverside Pub at 2:30 a.m. where she worked as a bartender, Russell came to Ronnie's house, banging on the windows at 3:30 a.m. Feliciano testified that she went outside to talk to him, but he was drunk and angry because she had ignored his calls. Russell told Feliciano that if he discovered she was dating someone else, he would shoot them. Feliciano testified that Russell called her the next morning and reiterated the threat that he would shoot Feliciano's new boyfriend.

**{¶ 5}** On November 1, 2009, Russell called Feliciano and asked to spend more time with her and their son. When she rejected the idea, he threatened to kill himself because she would not get back together with him.

**{¶ 6}** One night in early November, Russell came to the Riverside Pub where Feliciano was working. Feliciano was nervous because there was no one else inside the bar, so she sent a text message to the bar's owner, Robert Hacha ("Hacha"), informing him there was a problem. Hacha testified that he arrived at the bar a few minutes later and observed Russell in the kitchen, where patrons are not permitted, and saw Feliciano crying. Hacha told Russell to leave the bar.

**{¶ 7}** Shortly thereafter, Feliciano's cell phone began ringing repeatedly. She showed the phone's caller ID to Hacha, who saw that it was Russell who was calling. Feliciano answered one of the calls, and Hacha listened to the conversation on speaker phone. They both heard Russell say: "I swear to God, I'll fucking kill you, you bitch." Russell also told her that her children would be orphans and that it would be her fault. When the phone call ended, Feliciano reported the threats to the police, who came to the Riverside Pub and made a report of the incident.

**{¶ 8}** Russell called several witnesses in his defense, including his wife. Kimberly Shaffer, Russell's sister, testified that she never saw Russell and

Feliciano arguing, and that she believed they were still a couple through the end of November 2009. She presented several photos of Tony that she took on several dates after October 1, 2009 to demonstrate that Feliciano and Russell still had a friendly relationship during that time. Other defense witnesses also described having seen Feliciano and Russell together at parties after she moved out of his house.

**{¶ 9}** At the conclusion of the trial, the jury found Russell guilty of two counts of menacing by stalking, one of which included a furthermore specification alleging that he threatened Feliciano with physical harm. They found him not guilty of telecommunications harassment. The court sentenced Russell to ten months on the felony charge of menacing by stalking, 30 days on the misdemeanor charge, which had already been served, and three years' postrelease control. This appeal followed.

**{¶ 10}** In his two assignments of error, Russell argues his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence.

**{¶ 11}** The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Thompkins*, 78 Ohio St.3d 380, 390, 1997-Ohio-52, 678 N.E.2d 541. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the

prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 942, paragraph two of the syllabus.

{¶ 12} A challenge to the manifest weight of the evidence attacks the verdict in light of the State's burden of proof beyond a reasonable doubt. *Thompkins* at 386-87. A reviewing court may reverse the judgment of conviction if it appears that the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id. A finding that a conviction was supported by the manifest weight of the evidence necessarily includes a finding of sufficiency. Id. at 388.

{¶ 13} Russell was convicted of two counts of menacing by stalking in violation of R.C. 2903.211(A)(1), which provides: "No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or cause mental distress to the other person."

{¶ 14} The "state need only show that a defendant knowingly caused the victim to *believe* that he would cause her mental distress or physical harm." (Emphasis in original.) *State v. Hart*, Warren App. No. CA2008-06-079, 2009-Ohio-997, ¶31. Therefore, "neither actual physical harm nor actual

mental distress is required." Id., quoting *State v. Horsley*, Franklin App. No. 05AP-350, 2006-Ohio-1208, ¶45, 47.

> At trial, Feliciano testified that in the weeks following the breakup, Russell began continually calling her, showing up without notice at work and at her brother's house, sometimes in the middle of the night. On October 30, 2009, after ignoring Russell's phone calls, he came to her brother's house, banging on the window at 3:30 a.m. He was drunk and angry and threatened to kill her new boyfriend. Feliciano described the incident as follows:

> "A: He said that he tried to call me several times and I didn't answer * * *. So he drove past the house, saw the light was on, and I was not answering. So he stopped and banged on the window until I came out.

> * *

> "He was angry. He said if he found out that I was, in fact, with somebody in there, that he would shoot them. * * *

> "* * * He knew I was seeing somebody, and that he was not going to let that happen.
> "Q: He was going to shoot them. What was he going to shoot them with?

> "A: The gun that he claimed he had underneath his driver's seat. He said, [']I have a gun in my fucking car. Do you want to go look?['] He asked me several times to go look underneath his seat. I didn't want to. I didn't want to leave the front door.

> * *

> "Q: What were you thinking when he said this?

> "A: I was thinking that I had to try to calm him down and get him to leave, and say whatever it took for him to go in peace so I can get back in the house safely."

{¶ 15} On another night, after learning that Feliciano was out with her friend Kayla, Russell went to find them at a club they frequented. He found them and drove Feliciano home so they could discuss what they were going to do about their baby and their relationship. When they arrived at Feliciano's home, Russell asked to come inside with her but she refused. He followed her up the driveway, grabbed her, and would not let her go inside the house. Feliciano testified:

> "He threw himself on the floor, said that he was having a heart attack, that he couldn't — it was hurting too much. He didn't know what to do. He was going to kill himself. He just couldn't take it anymore. It was just really crazy, drastic, dramatic."

{¶ 16} Finally, in early November, Russell came to the Riverside Pub while Feliciano was working. There was no one else inside the bar, and he followed her into the kitchen. Feliciano testified that he was angry, screaming at her, and grabbing her, and, she described his behavior as "crazy." She was nervous about being alone with him so she sent two text messages to Hacha, the bar owner, telling him that Russell was there and that there was a problem. A few minutes later, Hacha entered the bar, and Russell immediately walked away from Feliciano whom he had backed into the grill. When the prosecutor asked Feliciano to describe her demeanor at this time, she responded: "I was shaking, scared, crying."

After Russell left the bar, he called Feliciano's cell phone several times. Feliciano allowed Hacha to listen to the conversation, which she described as follows:

"A: He just said that he would just see me after I got out of work, and to watch out.  He just said, [']I swear to God, I'll fucking kill you, you bitch.[']"

* *

"Q: What were you thinking when you heard that?

"A: I was thinking that it just got too far and it was out of my control. * * *

"I begged him to stop.  I told him that I didn't want it to go this route. I asked him to please be civil for the sake of our child.  He said, [']Yeah, your kids.  Why would you do this to your kids?[']  I said, [']What do you mean?  My kids have nothing to do with this.[']  He said, [']They have everything to do with it if they become orphans because they will lose their mother.  It could be so much easier if you just took me back.[']

"Q: What did you think of that?

"A: I thought he was serious.  I thought that he was going to hurt me."
**{¶ 17}** Upon review of this testimony, we find a rational jury could have found, beyond a reasonable doubt, that Russell knowingly caused Feliciano to believe he would cause her physical harm and did cause her mental distress. Although several defense witnesses described several occasions when they had seen Russell and Feliciano being friendly to each other after she moved out of Russell's house, this evidence does not refute the evidence of Russell's unpredictable and threatening behavior.  Moreover, Feliciano's account of

the events was corroborated by other witnesses including Hacha, who overheard Russell's murder threat. Therefore, after reviewing the record, we cannot say that the jury lost its way in finding the evidence presented by the state supported appellant's menacing by stalking convictions. Therefore, because we cannot say Russell's convictions constituted such a manifest miscarriage of justice that they must be reversed, we find no reason to disturb the jury's finding of guilt.

{¶ 18} Accordingly, the two assignments of error are overruled.

Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
COLLEEN CONWAY COONEY, JUDGE

PATRICIA ANN BLACKMON, P.J., and
LARRY A. JONES, J., CONCUR